# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA INC. and<br>ID SOFTWARE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>OCULUS VR, LLC, PALMER LUCKEY,<br>and FACEBOOK, INC.<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL CASE NO. 3:14-cv-01849-P**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiffs ZeniMax Media Inc. and id Software LLC (collectively, "ZeniMax") bring this Complaint against Oculus VR, LLC, Palmer Luckey, and Facebook, Inc. (collectively, "Defendants"), and in support thereof allege as follows, upon personal knowledge as to themselves and upon information and belief as to all others:

**NATURE OF THE ACTION**

1. Under a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment. This valuable intellectual property included copyrighted computer code, trade secret information, and technical know-how. The Non-Disclosure Agreement expressly provides that ZeniMax's intellectual property is confidential, owned exclusively by ZeniMax, and cannot be disclosed to or used by any third parties without ZeniMax's prior written approval. Defendants have wrongfully taken that ZeniMax intellectual property and commercially exploited it for their own gain. Defendants now stand to realize billions of dollars

in value from ZeniMax's intellectual property. Defendants never obtained a license for the use of ZeniMax's property, nor any right to sell or transfer it to third parties. By this action, ZeniMax seeks damages that will fairly and fully compensate it for Defendants' infringement and misappropriation of its intellectual property. Without this relief, Defendants will continue to profit unjustly.

## PRELIMINARY STATEMENT

2. For half a century, computer programmers have written software that allows users to explore imaginary worlds. Virtually all of that software has been written for presentation on computer monitors and television screens. In recent years, however, technological advances have led software and entertainment industry observers to suggest that the future of entertainment software and interactive media will include "virtual reality" ("VR"), i.e., the display of imaginary worlds in goggle-like headsets that provide video and audio, thereby immersing the user entirely in the projected environment. Instead of pressing a key or moving a game controller to explore the virtual environment, users could simply turn their heads to look around, as they do in real life.

3. Previous efforts to develop virtual reality have been frustrated by the significant technical challenges associated with creating a fully immersive user experience. There are complex technical difficulties associated with rendering an imaginary world in a convincing and naturalistic way without optical distortion, while simultaneously coordinating a user's movements with the view presented on-screen without introducing a disorienting delay between the user's action and the corresponding change in display.

4. For many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technologies. In 2011 and

2012, John Carmack, a singularly experienced and highly proficient ZeniMax programmer who was at that time Technical Director for ZeniMax's Texas-based subsidiary, id Software, conducted research to address technological issues associated with virtual reality. Carmack and other ZeniMax employees conducted that research at ZeniMax offices, on ZeniMax computers, and using ZeniMax resources.

5. In April 2012, Carmack began corresponding with Palmer Luckey, a college-aged video game enthusiast living in southern California. Luckey was working on a primitive virtual reality headset that he called the "Rift," which featured a display with a wide field of view. From his work at ZeniMax, Carmack believed that a wide field of view may be helpful in creating an immersive virtual reality experience.

6. At that time, the Rift was a crude prototype that lacked a head mount, virtual reality-specific software, integrated motion sensors, and other critical features and capabilities needed to create a viable product. Carmack was given a copy of the prototype by Luckey, and Carmack and other ZeniMax personnel added numerous improvements to the prototype. Together, those ZeniMax employees literally transformed the Rift by adding physical hardware components and developing specialized software for its operation. In addition, ZeniMax modified the Rift headset to work with id Software's well-known computer game "*DOOM 3: BFG Edition*" which enabled ground-breaking demonstrations of ZeniMax's virtual reality technology. ZeniMax's efforts represented an enormous technical advance in the development of virtual reality entertainment.

7. ZeniMax disclosed its proprietary hardware and software enhancements to Luckey pursuant to a Non-Disclosure Agreement that ZeniMax had entered into with Luckey. Subsequently, at the Electronic Entertainment Expo ("E3") industry convention held in Los

Angeles in June 2012, Carmack gave demonstrations of ZeniMax's virtual reality technology. ZeniMax employees arranged those demonstrations by appointment only, within the booth of ZeniMax's subsidiary Bethesda Softworks. ZeniMax scheduled appointments with a wide variety of industry and traditional media outlets to promote its new virtual reality technology. Based on those demonstrations, as well as Carmack's public support and ZeniMax's marketing efforts, ZeniMax's heavily-modified Rift and its related virtual reality technology attracted considerable acclaim and attention.

8. Luckey recognized the extraordinary value that ZeniMax, a global leader in interactive entertainment content, and its employee Carmack, a uniquely experienced and widely acclaimed programmer, added to the modified Rift headset. Luckey also recognized the skyrocketing interest in and public support for virtual reality technology that had been generated by ZeniMax. Only days after the E3 Convention, Luckey formed his company – then called Oculus LLC – to commercialize the Rift.

9. Oculus used ZeniMax's hardware and software technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift hardware. An SDK permits programmers to make use of new hardware by providing the technical specifications by which a computer communicates with that hardware, as well as program code that allows utilization of the hardware's functions. ZeniMax designed the specifications and functionality embodied in the Rift SDK, and directed its development.

10. Throughout 2012, Oculus and Luckey lacked the necessary expertise and technical know-how to create a viable virtual reality headset. In the months following E3, Oculus and Luckey sought that expertise and know-how from ZeniMax. Without it, there would not have been a viable Rift product.

11. Beginning after the E3 Convention in June 2012, and continuing through the winter of 2013, Oculus and ZeniMax entered into discussions regarding how Oculus would appropriately compensate ZeniMax for the use of ZeniMax's intellectual property in the modified Rift and related virtual reality technology. However, in the wake of the critical acclaim generated at the E3 Convention, others had joined Luckey at Oculus seeking to commercialize and profit from ZeniMax's technology, including by obtaining financing for Oculus. During the rest of 2012, Oculus and Luckey became increasingly evasive and uncooperative in discussions with ZeniMax regarding appropriate compensation for its technology and support. No resolution of that issue was reached, and indeed Oculus never provided ZeniMax with any compensation whatsoever.

12. On March 25, 2014, less than two years after Luckey formed Oculus, Facebook Inc. ("Facebook") announced that it would acquire Oculus with its modified Rift and related virtual reality technology for approximately $2 billion in cash and stock, thereby confirming the enormous value of the intellectual property that ZeniMax had created, and that Oculus and Luckey had taken.

13. On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times*, *Wall Street Journal*, and *USA Today*.

14. On July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey in this action, Facebook closed on its acquisition of Oculus. In public statements, Facebook has confirmed its intention to make use of Oculus's virtual reality technology – which

is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

## PARTIES

15. Plaintiff ZeniMax Media Inc. is a Delaware corporation with its principal place of business in Rockville, Maryland.

16. Plaintiff id Software LLC, a wholly-owned subsidiary of ZeniMax Media Inc., is a Delaware limited liability company with its principal place of business in Richardson, Texas.

17. Defendant Oculus VR, LLC is a Delaware limited liability company that is wholly owned by Facebook, Inc. It is the corporate successor both of Oculus VR, Inc., a Delaware corporation, and of that corporation's predecessor Oculus LLC, a California limited liability company. As used herein, "Oculus" shall refer to Oculus VR, LLC and its corporate predecessors, Oculus VR, Inc. and Oculus LLC as appropriate. Oculus may be served with process by service upon its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware. Oculus's principal business office is 1601 Willow Road, Menlo Park, California, which is the corporate headquarters of Facebook, Inc. Oculus also has an office in or near Dallas, Texas.

18. Defendant Palmer Luckey, an individual who is the founder of Oculus, resides (or recently resided) at 6301 East Seaside Walk, Long Beach, California, and may be served with process by service at his place of employment, Oculus.

19. Facebook, Inc. is a Delaware corporation. Its principal business office is 1601 Willow Road, Menlo Park, California. Facebook may be served with process by service upon its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

## JURISDICTION AND VENUE

20. The Court has jurisdiction in this Action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) because this is a civil action arising under 17 U.S.C. § 101 et seq. (federal copyright law) and 15 U.S.C. § 1051 et seq. (federal trademark law). The Court has supplemental jurisdiction over claims arising under the laws of Texas pursuant to 28 U.S.C. § 1367 because ZeniMax's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

21. Venue is proper in this District because (1) a substantial part of the events giving rise to the claims occurred in the Northern District of Texas; (2) Luckey contractually agreed to personal jurisdiction in Dallas County; and (3) Defendants are otherwise subject to personal jurisdiction in the Northern District of Texas. *See* 28 U.S.C. § 1391(a).

## FACTS

### A. ZeniMax, id Software, and Carmack

22. ZeniMax was established in 1999 as the parent company for the acquisition of Bethesda Softworks, a developer and publisher of numerous successful video games. In the years following its inception, ZeniMax established and acquired additional video game studios and game franchises, bringing together world-class artists, producers, designers, engineers, and coders to create "AAA" (i.e., industry best-in-class) video games for its publishing business.

23. On June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of video game franchises, three-dimensional (3D) computer graphics technology, and video game engines. id Software's franchises include the popular video games "*DOOM*," "*Quake*," "*Wolfenstein*," and "*RAGE*." Through its acquisition of id Software, ZeniMax acquired clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

24. At the time of its acquisition of id Software, ZeniMax entered into employment agreements with several of id Software's key employees, including Carmack. Carmack was one of id Software's founders and served as its Technical Director.

25. In his employment agreement with ZeniMax, Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that Carmack created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment:

6. WORK FOR HIRE; ASSIGNMENT OF INVENTIONS.

Employee acknowledges and agrees that any copyrightable works prepared by Employee within the scope of Employee's employment are ***"works for hire"*** under U.S. and international copyright laws and that the Company will be considered the author and owner of such copyrightable works. Employee agrees that all Inventions that (i) are developed using equipment, supplies, facilities or trade secrets of id Software or the Company, (ii) result from work performed by Employee for the Company, or (iii) relate to the Company's business or current or anticipated research and development, will be the sole and exclusive property of the Company or its designee and are hereby irrevocably assigned by Employee to the Company or its designee from the moment of their creation and fixation in tangible media; provided, however, that such Inventions are within the scope of Employee's employment or work performed by Employee for the Company or its subsidiaries, or are developed in whole or in part using Company's Confidential Information (defined in Section 10.4 below).

**B. <u>ZeniMax and Carmack Research VR Technology</u> (pre-2012)**

26. For years, dating back to the 1990s, ZeniMax and its affiliates had conducted research into virtual reality technology and headsets (sometimes called "head mounted displays" or "HMDs"). For example, ZeniMax had developed prototype software for its major video game franchises, including "*The Elder Scrolls*," designed to optimize the gaming experience in a virtual reality display device. ZeniMax's subsidiary, id Software, also researched virtual reality and continued its efforts following its acquisition by ZeniMax. Carmack highlighted those efforts in public remarks at the E3 Convention in 2012:




> *"Twenty years ago, id Software was involved with a number of VR companies. We had* Wolfenstein*,* DOOM*, and* Quake *licenses and all of these companies they just knew weren't going anywhere because they were very enthusiastic about the huge merits of VR and what it's going to do for all of this. But they really didn't have the, the serious technical people that were going to make the advances necessary to make it happen."*

(Interview, *John Carmack Interview at E3 2012: Oculus Rift Virtual Reality Headset*, available at http://www.youtube.com/watch?v=UyuMVazQPos (published June 13, 2012) (emphasis added).)

27. In 2011, ZeniMax actively pursued that research, including experiments with various off-the-shelf headsets. However, none provided an experience sufficiently immersive and responsive to be commercially successful. A significant limitation was "latency" – the delay between a user's movement and the corresponding change in the displayed image.

28. By 2012, ZeniMax employees, including Carmack, had amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous virtual reality experience (the "VR Technology").

29. ZeniMax planned to demonstrate its VR Technology at the E3 Convention in June 2012, using one of its leading brands, "*DOOM 3: BFG Edition*." On or about March 7, 2012 – a month before ZeniMax obtained a prototype Rift or had any contact with Luckey – id Software's Creative Director tested a virtual reality headset in ZeniMax's offices using ZeniMax's VR Technology, as shown in this photograph posted online by id Software at that time:




**C. ZeniMax Begins Work On Rift Prototype**
**<u>And Enters Into A Non-Disclosure Agreement With Luckey</u>**
**(April-May 2012)**

30. In April 2012, Carmack discovered through an Internet forum that Luckey had assembled a primitive headset that Luckey called the "Rift." Up to that point, Luckey – then a college-age student – had been trying to develop an improved 3D-display device. But, notwithstanding multiple prototypes and discussions with fellow 3D and virtual reality enthusiasts, Luckey never developed a viable display, and lacked the technical expertise to create one. Carmack contacted Luckey to obtain a Rift prototype. Luckey was flattered by Carmack's interest, and sent a Rift prototype to Carmack's ZeniMax office in Texas.

31. At ZeniMax's offices, Carmack evaluated, analyzed, and began modifying the Rift prototype using ZeniMax's VR Technology. At that time, the Rift was a crude prototype. Little more than a display panel, it lacked a head mount, virtual reality-specific software, integrated motion sensors, and other critical features and basic capabilities needed to create a viable product.

32. Carmack made breakthrough modifications to the Rift prototype based upon years of prior research at ZeniMax. Among other improvements, Carmack identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; and programmed software to reduce latency and to prevent distortions. Carmack noted some of that work in public remarks at the E3 Convention in 2012:




> "*So what happened on this is . . . I've got my five different head mounts in my office, . . . and I'm pursuing lots of different axes of improvement; low latency is one of them . . . wide field of view is another, absolute positioning is another one, but I was building these things myself, and then I came across this guy Palmer Luckey . . . He's been building this in his workshop. He's offering, going to be*

> *offering this as a kit for only $500 <u>for the optics</u>. He just sent it to me – <u>the optics</u> – I added my sensors, and the strap, and the software and stuff onto here.*"

(Interview, *Creator of Doom John Carmack Shows His Reality at E3 2012*, available at http://www.youtube.com/watch?v=GVDXXfbz3QE (published June 9, 2012) (emphasis added).) Carmack would later publish a white paper in 2013 describing in general terms one of these axes of improvement – "latency mitigation" – which has been frequently cited as one of the primary competitive advantages of the modified Rift. ZeniMax planned to demonstrate its soon-to-be-released game, "*DOOM 3: BFG Edition*," on the modified Rift at the E3 Convention in June 2012.

33. As a result of their years of research, and months of hard work modifying the prototype Rift to incorporate ZeniMax's VR Technology, Carmack and others at ZeniMax transformed the Rift from $500-worth of optics into a powerful, immersive virtual reality experience. ZeniMax's modified Rift featured the "Holy Grail" combination of specially-tailored hardware and innovative software. Both are necessary to create an optimal user experience.

34. ZeniMax and Luckey anticipated that demonstrations of the modified Rift would draw significant public and industry attention. In order to protect its proprietary VR Technology, ZeniMax executed a non-disclosure agreement with Luckey, effective May 24, 2012 (the "Non-Disclosure Agreement").

35. The Non-Disclosure Agreement defines ZeniMax's "Proprietary Information" as follows:

> 1. **Proprietary Information.** ***"Proprietary Information"*** means all information and know-how, regardless of whether or not in writing, of a private, secret or confidential nature that relates to the business, technical or financial affairs of the Disclosing Party, its parent, subsidiaries, affiliates, licensors, customers, potential customers, suppliers or potential suppliers provided or disclosed to the Receiving Party or which becomes known to the Receiving Party, whether or not marked or otherwise designated as "confidential", "proprietary" or with any other legend indicating its proprietary nature. Proprietary Information includes, by way of illustration and not limitation, all forms and types of financial, business, scientific, technical, or engineering information, including patterns, plans, compilations, inventions and developments, products, formulas, designs, prototypes, methods, techniques, processes, procedures, computer programs and software (whether as source code or object code), documentation, technologies, plans, research, marketing, and reports, other technical information relating to the Disclosing Party's business, and any information not generally known to the public or within the industry or trade in which the Disclosing Party competes, whether tangible or intangible, and whether or not stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

36. The Non-Disclosure Agreement prohibits Luckey from using or disclosing ZeniMax's Proprietary Information, including its trade secrets, as follows:

> 2. **Duties.**
>
> a. **Maintenance of Confidentiality.** With respect to the Disclosing Party's Proprietary Information, the Receiving Party undertakes and agrees that Receiving Party shall secure and keep such Proprietary Information strictly confidential and:

[…]

> (ii) Restrict disclosure to those of its directors, officers, employees or attorneys who clearly have a need-to-know such Proprietary Information, and then only to the extent of such need-to-know, and only in furtherance of the Proper Purpose;
>
> (iii) Use such Proprietary Information only for the Proper Purpose and not disclose such Proprietary Information other than as set forth above unless the Disclosing Party shall have expressly authorized such disclosure in advance in writing; and
>
> (iv) Not use any Proprietary Information to compete or obtain any competitive or other advantage with respect to the Disclosing Party.

(The term "Proper Purpose" is defined in the Non-Disclosure Agreement to mean purposes for which the parties agree in writing.)

37. The Non-Disclosure Agreement expressly states that ZeniMax retains exclusive ownership of the confidential and proprietary information disclosed under the Agreement:

> b. **Ownership.** All Proprietary Information, including but not limited to that which is contained in files, letters, memoranda, reports, records, data, sketches, drawings, notebooks, program listings, or other written, photographic, or other tangible, intangible, or other materials, or which shall come into the Receiving Party's custody or possession, is and at all times shall be the exclusive property of the Disclosing Party, and shall be used by the Receiving Party only for the Proper Purpose.

38. Luckey agreed to be bound by all terms and conditions in the Non-Disclosure Agreement:

> IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date and agree to be legally bound by all terms and conditions contained herein.
>
> ID SOFTWARE LLC,
> on its own behalf and on behalf of
> ZENIMAX MEDIA INC. (including its divisions and affiliates)
>
> By:
> Name: J. Griffin Lesher
> Title: Secretary
>
> Palmer Luckey

**D. <u>ZeniMax Demonstrates Its Breakthrough VR Technology to Critical Acclaim (May-June 2012)</u>**

39. On May 25, 2012, Carmack sent Luckey an e-mail describing his progress in applying ZeniMax's VR Technology to the modified Rift, and discussed upcoming demonstrations of the modified Rift for the public and the press. Carmack stated, "I think this combination is going to finally 'do it' for VR." He was correct.

40. On the eve of the E3 Convention, Carmack demonstrated the modified Rift that embodied ZeniMax's VR Technology to an online news publisher, *The Verge*. The

demonstration took place in Carmack's id Software office in Texas and was arranged by ZeniMax employees. *The Verge* later published an online video of the demonstration, reporting:




> *"I am here in Dallas, Texas, id Software, mad scientist lab of John Carmack – by his own admission – and we're here checking out this head mounted display. Now I know you've heard these virtual reality things have been done for years and years and years. This is a lot different. This is an early prototype. We're using a* <u>*heavily modified*</u> *Oculus Rift headset. . . . [T]here's wires everywhere. John's actually going to help me put this on. . . . This head mounted display is really like no other."*

(Interview, *Ross Uses John Carmack's Head Mounted Display*, available at http://www.youtube.com/watch?v=vIkrQK60N-4 (published May 30, 2012) (emphasis added).)

41. On May 30, 2012, *The Verge* published an article that included this video and highlighted ZeniMax's work on the Rift and virtual reality technology.

42. At the E3 Convention held in Los Angeles from June 5-7, 2012, ZeniMax showcased a specially-configured version of ZeniMax's "*DOOM 3: BFG Edition*" video game using the modified Rift. These compelling demonstrations were conducted by ZeniMax

employees in Bethesda Softworks' booth by appointment only, as reflected in the following photograph:



ZeniMax invested time and resources in scheduling press interviews and demonstrations for the event, which succeeded in garnering world-wide publicity for the modified Rift.

43. The response to the modified Rift at E3 was so strong that Carmack dedicated a second full day to encore demonstrations. Carmack remarked that "every one of the journalists left enthusiastic about it, with several bordering on awestruck." The modified Rift, as showcased by ZeniMax at the E3 Convention, was awarded the E3 Game Critic Award for "Best Hardware/Peripheral."

44. In June 2012, on the heels of executing the Non-Disclosure Agreement, and riding the wave of positive press that the modified Rift had received at E3, Luckey formed Oculus LLC, the corporate predecessor of Oculus VR, LLC.

45. A few days later, ZeniMax set up a file transfer protocol ("FTP") arrangement to send additional VR Technology to Luckey pursuant to the Non-Disclosure Agreement:*

**From:** John Carmack
**Sent:** Monday, June 11, 2012 5:02 PM
**To:** palmer REDACTED
**Subject:** demo code

The gear still isn't back from E3, so I haven't been able to put anything together yet. When I do, is there a convenient way to send a large (several hundred megs) zip file to you? I can have IT set up a temporary FTP here if you don't have anywhere I can safely put it.

46. ZeniMax sent Luckey additional proprietary information on an ongoing basis:

**From:** John Carmack
**Sent:** Friday, June 15, 2012 10:50 PM
**To:** palmer REDACTED
**Subject:** hmdtest executable

I tidied up my R&D exe a bit so it works without a headtracker, but it is so much less cool without it... The native warping doesn't look so terrible when the view is only joystick controlled, but you can still tell what is going on with long flat edges. If you have any problems with this, I can probably tweak it quickly and get another one off to you now that we are all set for transfers.

47. Luckey used ZeniMax's VR Technology that he acquired through the FTP site and otherwise to create and promote the modified Rift headset.

48. Around the same time, ZeniMax also sent cables and customized sensors to Luckey and disclosed – pursuant to the Non-Disclosure Agreement – additional hardware design improvements regarding optics calibration and sensor mounting.

49. Throughout June 2012, Luckey repeatedly emailed ZeniMax seeking and receiving access to ZeniMax's accumulated proprietary information, trade secrets, and know-how.

---

* E-mail addresses are redacted from documents shown in this public filing.

**E. Oculus and Luckey Refuse to Compensate ZeniMax**
**<u>For Their Use of ZeniMax's Intellectual Property</u>**
**(June-July 2012)**

50. In June 2012, Oculus and Luckey worked to commercialize the modified Rift by preparing to offer a first edition of the Rift via "Kickstarter," an Internet fundraising site. To promote the Rift project on Kickstarter, Oculus and Luckey planned to create a video demonstrating the capabilities of the Rift headset, including the enhancements that ZeniMax had made to the Rift.

51. On June 20, 2012, Luckey sought ZeniMax's help in further promoting and endorsing the Rift headset. Luckey asked ZeniMax to put together a "cameo or blurb" for the planned Kickstarter video, and to include the Rift in Carmack's keynote speech at "QuakeCon," an annual convention for computer gamers sponsored by ZeniMax that was held on August 2-5, 2012 in Dallas:

**From:** Palmer Luckey [mailto: REDACTED ]
**Sent:** Wednesday, June 20, 2012 12:46 PM
**To:** John Carmack
**Subject:** Re: IMU arrived? HMD status?

Yes, I just got the IMU a few minutes ago. I have not been able to try out your R&D exe on my decent rig yet, I was having trouble getting my FTP software to work, and have not had a chance to try again, going to do that today.

[ …]

Sorry you have to move on to other projects, this looks like it is going to be a lot of fun! It would really help if I could get some kind of cameo or blurb from you to use in the Kickstarter video, that should be pretty easy to figure out. Beyond that, it would be fantastic to have you on board in whatever role you are able to play (Support, adviser, investor, etc) while still working on what you need to get done. One thing that would make a big difference is to, if at all possible, be involved somehow in your QuakeCon keynote. A lot of people make sure to watch that, and it could make a pretty cool show.

52. In response, ZeniMax suggested a formal agreement between ZeniMax and Oculus, stating: "Our end goal would be to see this evolve to a nice consumer level device that

is manufactured in enough quantities that it would make a meaningful impact on game sales, as well as being a profitable and sustainable hardware product."

53. Luckey acknowledged that ZeniMax is "probably in the best position for early game support," but Luckey ignored ZeniMax's request for compensation for ZeniMax's VR Technology.

54. On July 8, 2012, Luckey asked ZeniMax for a copy of ZeniMax's yet-to-be-released software: "Would it be possible to get my hands on the Doom 3 BFG demo? I am doing a new Kickstarter video, would help to have Doom so I can record a bit of gameplay."

55. On July 13, 2012, ZeniMax proposed a call with Luckey to discuss how headset development should proceed moving forward. Luckey ignored the request.

56. On July 17, 2012, ZeniMax improved the optics calibration for its "*DOOM 3: BFG Edition*" video game, and in doing so discovered that the Rift's optical calibration was off-center. ZeniMax suggested solutions to correct the Rift's optics calibration. Luckey later admitted that the calibration was "a lot more off than I would have thought."

57. On July 21, 2012, Luckey asked ZeniMax how to "flash" (i.e., install) customized firmware onto the sensors that ZeniMax selected for the modified Rift. ZeniMax provided that know-how, and further suggested an improved location on the modified Rift for mounting the sensor that "would be best from an alignment and rigidity standpoint." Luckey then sought ZeniMax's technical guidance regarding the selection of low latency cables.

58. On July 25, 2012, Luckey asked ZeniMax for the customized binary code for the tracking sensors that Carmack had added to the modified Rift. Pursuant to the Non-Disclosure Agreement, ZeniMax provided Luckey with a link to an FTP site to download the binary code.

Luckey downloaded the customized binary code and used it for future demonstrations of the modified Rift.

### F. ZeniMax Instructs Oculus and Luckey Not to Use Its Intellectual Property As Oculus and Luckey Actively Begin Commercializing The Rift (July-August 2012)

59. On July 26, 2012, Luckey again asked for ZeniMax's help with the Kickstarter video, specifically asking Carmack to provide a clip "talking about the Rift/VR in general/whatever else you think would be a great thing to have." Luckey further acknowledged: "Your reputation has really helped the credibility of this project, and having that credibility in the video would make a big difference for alot [sic] of people." Carmack declined Luckey's request to appear in the Kickstarter video.

60. At about that same time, Carmack advised Luckey: "It is very important that you NOT use anything that could be construed as Zenimax property in the promotion of your product. Showing my R&D testbed with the Rage media would be bad, for instance."

61. Luckey replied, "I will make sure we do not show the Rage demo in the Kickstarter, but is there any chance we can mention support/show a quick clip from Doom 3/BFG Edition?" ZeniMax turned down Luckey's request, instructing that Luckey rely on publicly-available information for Kickstarter promotional material.

62. On August 1, 2012, Luckey launched the Oculus Kickstarter campaign. The funding target was set at $250,000. The Kickstarter page featured a five-minute video describing the modified Rift headset.

63. In blatant disregard of ZeniMax's rights, Oculus and Luckey used ZeniMax's intellectual property in the Kickstarter video. The video features multiple clips showing "*DOOM 3: BFG Edition*," displayed on the modified Rift headset. The video also used "*DOOM 3: BFG Edition*" to promote the modified Rift by displaying, without authorization, ZeniMax's

logo for "*DOOM 3: BFG Edition*" as the first Oculus-Rift ready game. Further, despite the lack of any commercial agreement with ZeniMax, Oculus and Luckey promised that certain backers of the Kickstarter campaign would receive copies of ZeniMax's game "*DOOM 3: BFG Edition*" with support for the modified Rift.

64. The Kickstarter video also identifies "ultra-low latency head tracking" as "the magic that sets the Rift apart." According to the video, "[o]ne of the biggest problems with virtual reality up to this point is latency. The benefit of the Rift is that it is designed to be really really low latency." The low latency head tracking highlighted in the Kickstarter video refers to ZeniMax's VR Technology.

65. The use of ZeniMax's VR Technology by Oculus and Luckey directly resulted in the success of the Kickstarter project. Only four hours after the project launch, the Kickstarter project reached $350,000 in funding, far surpassing its original goal. Ultimately, the Kickstarter project raised $2.44 million in funding from nearly 10,000 contributors.

66. During the summer of 2012, Oculus and Luckey also used ZeniMax's VR Technology to demonstrate the modified Rift to potential investors in Oculus. As reported in the Wall Street Journal, Oculus's current Chief Executive Officer, Brendan Iribe, met Luckey in a Long Beach, California hotel room, where Iribe was "transported to a three-dimensional view of a room from 'Rage,' a sci-fi shooting game." "*RAGE*" is a video game developed and owned by ZeniMax. Shortly thereafter, Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.

67. In August 2012, Oculus and Luckey promoted the modified Rift at the annual id Software-sponsored gaming convention in Dallas called "QuakeCon," which is attended by thousands of video gamers and industry press. Oculus had booth space at that convention in

which it demonstrated the modified Rift, which embodied and incorporated ZeniMax's VR Technology.

68. At QuakeCon, Oculus, lacking sufficient virtual reality expertise, could not get the modified Rift to function properly without ZeniMax's technical assistance. This photograph taken at QuakeCon shows Carmack getting the modified Rift to function for Luckey:



69. On August 5, 2012, Luckey appeared on a panel at QuakeCon at ZeniMax's invitation. During his appearance on that panel, Luckey further promoted the modified Rift, and acknowledged ZeniMax's critical contributions to the development of the modified Rift:




> "*First, I'd like to just really quickly address what Carmack said .... where he likes to do software [and] where he's looking for people to do the hardware. I'm the opposite; <u>I can't do software at all</u>. ... So it's really amazing to have so many people that are interested in software interested in a hardware platform <u>because I can't do that, at all,</u> and it's so exciting to see that people are into it.*"

(Interview, *QuakeCon 2012 Panel – Virtual Insanity*, available at http://www.youtube.com/watch?v=8gaqQdyfAz8 (published Aug. 5, 2012) (emphasis added).)

### G. ZeniMax Further Presses Oculus and Luckey Regarding <u>Compensation For Use Of ZeniMax's Intellectual Property</u> (August 2012)

70. A few days after the successful Kickstarter launch, Oculus contacted ZeniMax to discuss "working together more closely" and a potential "partnership" with one of ZeniMax's subsidiaries, Bethesda Softworks. ZeniMax met with Oculus and discussed ZeniMax having an equity stake in Oculus to compensate ZeniMax for Oculus's dependence on ZeniMax's proprietary VR Technology. Oculus said that it would take the proposal to its board.

71. Oculus and ZeniMax also discussed showing "*DOOM 3: BFG Edition*" at various upcoming conventions. Pursuant to the Non-Disclosure Agreement, ZeniMax provided Oculus

with an executable version of "*DOOM 3: BFG Edition*," but required Oculus to obtain approval from ZeniMax for each additional showing, and to that end requested a schedule of anticipated demonstrations of the modified Rift.

72. On August 7, 2012, Oculus's CEO Iribe followed up that meeting with an e-mail to Todd Hollenshead, president of id Software, acknowledging ZeniMax's "incredible support":

> From: Brendan Iribe [mailto REDACTED
> Sent: Tuesday, August 07, 2012 11:13 PM
> To: Todd Hollenshead
> Subject: Connecting
>
> Hi Todd,
>
> Thanks for taking the time to talk today and for all the incredible support you, John, and id have provided.
>
> I'm sure you, especially John, hear this all the time, but Mike and I grew up addicted to Doom and Quake, even to the point of almost failing out of college and then Scaleform because we couldn't stop playing Quake. Working with id nearly 15 years later is a true honor.
>
> We're determined to do everything we can to make you guys happy with the hardware and experience. I'm off to China tonight to get the ball rolling on manufacturing the dev kits, which must ship in December.
>
> Everyone at Oculus is looking forward to working with you guys.
>
> Dinner and beers on me in LA soon.
>
> Thanks again,
> -- Brendan

73. On August 10, 2012, ZeniMax reiterated to Oculus its request to discuss compensating ZeniMax with equity in Oculus. Oculus did not respond.

74. On August 16, 2012, ZeniMax reiterated its request to Oculus not to disclose or discuss anything about future ZeniMax titles, release dates, timing, or future commitments.

## H. <u>ZeniMax's Discussions With Oculus and Luckey Falter</u> (August 2012-January 2013)

75. On August 22, 2012, Oculus informed ZeniMax that it had been performing multiple presentations of "*DOOM 3: BFG Edition*" "behind closed doors" at the Gamescom, Unite, and PAX Prime computer gaming conferences.

76. In response, ZeniMax asked for an update on its request for an equity stake in Oculus to compensate ZeniMax for Oculus's use of its intellectual property:

**From:** Todd Hollenshead
**Sent:** Wednesday, August 22, 2012 10:40 AM
**To:** 'Nate Mitchell'
**CC:** Brendan Iribe
**Subject:** RE: Gamescom

Thanks for the update. I believe Tim will be headed to PAX, but I'm not certain of the timing on all of that. I'll look forward to the schedule and see what we can do.

Is there any update on the equity discussion we had at QuakeCon? Specifically Carmack and Altman asked me on the status so I wanted to follow-up.

Regards,

tsh

77. Oculus's CEO Iribe responded by asking when ZeniMax was available for a call, but otherwise side-stepped ZeniMax's question regarding equity, stating only:

**From:** Brendan Iribe [REDACTED]
**Sent:** Wednesday, August 22, 2012 4:54 PM
**To:** Todd Hollenshead
**CC:** Nate Mitchell
**Subject:** Re: Gamescom

We talked it over and everyone would really like to see Carmack/id (even Bethesda/ZeniMax) stay closely involved and aligned with Oculus and the Rift.

When are you available to jump on a call?

-- Brendan

78. On September 10, 2012, after multiple requests from ZeniMax to discuss compensation for ZeniMax's role in developing and promoting the Rift, Oculus drafted a proposal "designed to help kick off the formal discussion" on a future relationship with ZeniMax.

79. In its proposal, Oculus demanded that ZeniMax grant Oculus a worldwide, exclusive license to programming code that had been provided by ZeniMax pursuant to the Non-

Disclosure Agreement. Oculus also demanded that ZeniMax create additional intellectual property for Oculus's sole use:

- **Technical Advisor Support – Sharing Code**
  ZeniMax to grant Oculus a worldwide exclusive perpetual right and license to source code shared by Carmack regarding Oculus Rift support. This will be carefully defined, to only include specific source code that is directly related to the Oculus Rift VR headset support. It will not include video game or game engine code. Oculus will be permitted to incorporate the code into its SDK, which will then be reintegrated with id's game code.

  Oculus and Carmack (Zenimax) will work closely to create key IP that remains exclusive to Oculus and is not shared with other companies or competitors, such as improvements to the Oculus SDK and Rift hardware.

80. Oculus further demanded that ZeniMax provide extensive marketing and ten thousand free copies of "*DOOM 3: BFG Edition*" for Oculus to provide to its Kickstarter investors. In return for those demands, Oculus offered to ZeniMax an equity stake in the company of 2%, subject to dilution, which would only vest after three years, and then subject to additional conditions:

- **Technical Advisor Role**
  Zenimax will receive 2% membership interest equity units which vest over three years for John Carmack's participation as a technical advisor to Oculus. Such equity interest shall be subject to dilution resulting from additional grants of Oculus equity units.

81. Oculus also proposed that ZeniMax pay Oculus $1.2 million for an additional 3% stake.

82. On September 27, 2012, Oculus sent its latest "investor prospectus" to ZeniMax. The prospectus, which Oculus used or intended to use to recruit new investors, listed John Carmack as an "advisor/endorser" and used the id Software company logo next to Carmack's name. Neither Carmack nor id Software had authorized the use of their names and logos in the

prospectus, and neither had officially endorsed the Rift. The prospectus also featured "*DOOM*" logos on multiple slides. Other ZeniMax game logos were incorporated into the Oculus prospectus without ZeniMax's permission, and in disregard of ZeniMax's directives not to use ZeniMax property to promote the Rift.

83. The Oculus prospectus also included a "product roadmap" that represented that ZeniMax's franchises "*DOOM 3: BFG Edition*" and "*Skyrim*" would be made to work with the Rift. ZeniMax had no such agreement with Oculus.

84. On October 19, 2012, ZeniMax made a counter-proposal to Oculus, agreeing to provide on-going support, including much of the support requested by Oculus, as well as a license to ZeniMax's VR Technology that had been disclosed pursuant to the Non-Disclosure Agreement. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions.

85. On November 13, 2012, Oculus responded to this counterproposal, asserting that ZeniMax's proposal "is so far out of the ballpark, we're left wondering if there's any hope."

86. Notwithstanding the failure by Oculus and Luckey to engage in discussions with ZeniMax regarding these business issues (which one Oculus employee euphemistically termed "politics"), their senior personnel simultaneously continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology that Oculus needed for developing the Rift. For example, on November 22, 2012, Jack McCauley, Oculus's Chief Engineer, asked ZeniMax for assistance with an image display question, acknowledging that "Oculus is short handed in the system expertise":

**From:** jack jean mccauley REDACTED
**Sent:** Thursday, November 22, 2012 11:53 AM
**To:** John Carmack
**Subject:** RE: Display Question

Hi John;

For games that support the Rift, we will have to have them rotate the image inside the game engine. There's no plan to have the desktop in view for our developer versions. We'll also have to figure out the blasting mode. Not sure about this at the moment but I will ask Palmer about it.

Do you think there is a way to modify or put a filter driver in the system to rotate the desktop?

Oculus is short handed in the system expertise, but over the course of the next few months we will get this in order.

I'm not sure how much support we will need in the coming few weeks, and I don't get involve with politics but I understand that there is some issues there. I hope it works out.

-J

87. Similarly, on November 26 and 27, 2012, Oculus personnel contacted ZeniMax with further questions about ZeniMax's VR Technology. In particular, Oculus's CEO Iribe asked about virtual reality software development work that ZeniMax had performed in May 2012:

**From:** Brendan Iribe [REDACTED]
**Sent:** Monday, November 26, 2012 6:29 PM
**To:** John Carmack
**CC:** Michael Antonov
**Subject:** Gravity correction

Hi John,

We're tweaking the gravity correction and wanted to know how you implemented it in the Rage/Doom demo. Can you describe what you're doing?

-- Brendan

88. Michael Antonov, Oculus's Chief Software Architect, followed that up with a further question:

**From:** Michael Antonov [REDACTED]
**Sent:** Tuesday, November 27, 2012 11:11 AM
**To:** Brendan Iribe
**Cc:** John Carmack
**Subject:** Re: Gravity correction

HI John,

A more detailed question would be - how did you modify the motion for neck modelling, and did you observe an noticeable improvement (reduction in motion sickness effect) from doing so?

It'd be interesting to compare & contract implementations. This is what we do now for each BodyFrame message:

89. Oculus used ZeniMax's VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift hardware. As noted above, the Rift SDK permits programmers to make use of the Rift by providing the technical specifications by which a computer communicates with the device, as well as program code that demonstrates the Rift's functions. ZeniMax designed the specifications and functionality embodied in the Rift SDK, and directed its development.

90. On December 11, 2012, Oculus responded to ZeniMax's October 19, 2012, counter-proposal. Oculus's revised proposal would not grant ZeniMax any equity in Oculus, but would only permit ZeniMax to purchase equity in exchange for several million dollars and additional contributions. Oculus also circulated a revised investor prospectus that contained the same unauthorized references to ZeniMax intellectual property, wrongly suggesting ZeniMax's endorsement for the Rift, and omitting any disclosure of Oculus's use of ZeniMax's VR Technology, or Oculus's heavy reliance on ZeniMax to develop the Rift.

91. Oculus continued to seek resources and technical support from ZeniMax. On December 29, 2012, Oculus's CEO Iribe, who was leading negotiations with ZeniMax, emailed ZeniMax:

**From:** Brendan Iribe REDACTED
**Sent:** Saturday, December 29, 2012 7:53 PM
**To:** John Carmack
**Subject:** Oculus Dec update

Hi John,

[ … ]

We'd like to catch up on:

- **Oculus SDK and sensor** - it would be really helpful if we could get an updated tech ("room") demo that supports the new sensor. We use your room demo internally for benchmarking and testing. Sets the bar.

92. In mid-January 2013, Oculus demonstrated the Rift – now embodying more ZeniMax VR Technology – at the Computer Electronics Show ("CES") industry convention. Oculus used ZeniMax VR Technology without ZeniMax's permission and in disregard of ZeniMax's directives not to use ZeniMax property to promote the Rift. Luckey increasingly held himself out to the media and the public as the visionary developer of the Rift's VR Technology, which had actually been developed by ZeniMax without Luckey's involvement.

93. On January 22, 2013, Oculus began further efforts to obtain financing, and again invited ZeniMax to invest more money and resources in Oculus. Oculus's offer still did not provide any compensation for the contributions that ZeniMax had already made. Oculus continued to use ZeniMax VR Technology without license or permission to do so. Oculus and Luckey continue to promote themselves as the developer and owner of ZeniMax's breakthrough VR Technology.

**I. Oculus and Luckey Recruit Carmack And Other ZeniMax Employees To Obtain Further Access To ZeniMax's VR Technology**

94. In light of the refusal by Oculus and Luckey to enter into serious negotiations with ZeniMax, ZeniMax directed Carmack to cease providing proprietary information or other technological assistance to Oculus until a satisfactory business arrangement could be reached between Oculus and ZeniMax.

95. Rather than compensate ZeniMax for the use of its intellectual property, Oculus and Luckey then sought to obtain additional virtual reality know-how by recruiting ZeniMax employees, including Carmack, to join Oculus.

96. Carmack's employment contract with ZeniMax expired in June 2013. Carmack subsequently advised ZeniMax that he would not renew his employment at id Software. Carmack worked in the summer of 2013 as a part-time technical advisor for id Software after his employment contract ended pursuant to a three-month agreement.

97. In August 2013, Oculus announced that Carmack had joined Oculus as its Chief Technical Officer. In Oculus's press release, Oculus noted, "John is one of the brightest minds of our generation – pioneer, visionary, and industry legend. There are very few people in the world that can contribute to the Oculus Rift and the future of virtual reality like John can."

98. At a September 2013 press conference, Oculus representatives acknowledged the enormous contribution that Carmack had made to the Rift while he was employed at ZeniMax:



> *"It's hard to measure John's influence on Oculus, especially today when it's just starting, but, you know, John had, was an integral part of the project early on, with kicking this thing off in E3, and it was really, you know, a lot of that brilliance that and, and his credibility and his experience and sort of vision, that drove all that excitement back in E3 in 2012. . . . So today, John is the expert on computer graphics, game engines, but also you would be blown away by the amount of knowledge he has on all the hardware side of things and it's sort of the innovation he's bringing to the table – in terms of new ideas for things that we should be trying, some of which we haven't even thought about yet. So, and when it comes to display technology, the same thing."*

(Interview, *Gamescom 2013: Palmer Luckey and Nate Mitchell Talk Carmack, Infiniteye and The HD Prototype*, available at http://www.youtube.com/watch?v=zzleRdPjZIY (September 3, 2013).)

99. On February 17, 2014, five additional senior employees of ZeniMax, all of whom had worked closely with Carmack at id Software, simultaneously resigned. All of those employees had access to ZeniMax confidential information and trade secrets, and all were subject to strict post-employment confidentiality and non-solicitation obligations. At least one of

the resigning employees refused to certify to ZeniMax upon his resignation that all ZeniMax confidential information in his possession had been returned to ZeniMax.

100. All five of those former ZeniMax employees immediately joined Oculus.

101. On February 20, 2014, more than a month before there was any announcement of the acquisition transaction discussed below, ZeniMax sent a letter to Carmack reminding him of the provision of his Employment Agreement that obliged him to refrain from recruiting ZeniMax employees for two years following his employment from ZeniMax. A similar letter was sent to Oculus. The February 20, 2014 letter to Carmack also reminded Carmack that he agreed in his Employment Agreement that "all Inventions [he] created, made, conceived or first reduced to practice during and within the scope of [his] employment with [ZeniMax] are to be disclosed to [ZeniMax], and are the sole and exclusive property of [ZeniMax]."

102. Oculus continues to hire former ZeniMax employees who have had access to ZeniMax's intellectual property.

**J. Facebook Announces A $2 Billion Acquisition Of Oculus; Oculus and Luckey Continue Exploiting ZeniMax's Intellectual Property (March-April 2014)**

103. On March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock, thereby confirming the market value of the intellectual property that ZeniMax had provided to Oculus and Luckey pursuant to the Non-Disclosure Agreement. Following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of the VR Technology embodied in the Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing the factual basis for them.

104. In response to subsequent press coverage of ZeniMax's dispute with Oculus, Oculus then issued a remarkable press release stating that "ZeniMax has never contributed any

IP or technology to Oculus[.]" In that press release, an Oculus spokesperson acted as though ZeniMax were some unknown interloper, stating, "It's unfortunate, but when there's this type of transaction, people come out of the woodwork with ridiculous and absurd claims" – referring, respectively, to Facebook's planned acquisition of Oculus and to ZeniMax.

105. On April 19, 2014 – after ZeniMax's counsel had sent two letters to Oculus, and after ZeniMax had sent its February 20, 2014 letter to Carmack, Carmack revealed in a post on Twitter.com that he was "in a hurry" to re-implement code that he had previously written:




106. Carmack was referring to the job that he had held for the previous 20 years at id Software, including his work on the "exact needed code" he was now hurriedly rewriting at Oculus.

**K. Facebook Completes Its Acquisition Of Oculus With Full Awareness Of ZeniMax's Claims, And Announces Its Intention To Exploit <u>ZeniMax's Intellectual Property For The Financial Benefit Of Its Core Business</u> (April-July 2014)**

107. In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or

otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others." (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

108. In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

109. At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

110. Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.) An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.*, cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

111. On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's

filing of this action was widely covered in the national media, including in *The New York Times*, *Wall Street Journal*, and *USA Today*, and in the industry press.

112. On July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey in this action, Facebook closed on its acquisition of Oculus, and became the sole owner of Oculus.

113. Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

114. Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling virtual reality headsets. For example, in a March 25, 2014 investor call following Facebook's announcement of its intended acquisition of Oculus, an analyst asked:

> [W]hat do you envision the Oculus business model to look like eventually? Is it mostly hardware sales? Is it advertising/licensing? Or all of the above?

Facebook's founder and Chief Executive Officer Mark Zuckerberg responded to that question by stating:

> In terms of our own business model, we're clearly not a hardware company. <u>We're not going to try to make a profit off of the devices long term</u>. We view this as a software and services thing, where if we can make it so that this becomes a network where people can be communicating and buying things and virtual goods and there might be advertising in the world, but we need to figure that out down the line. Then I think that's probably where the business will come from, if I had to say.

(Emphasis added.)

115. Rather than make a profit off the sale of virtual reality headsets, Defendants intended to leverage and commercially exploit Oculus's virtual reality technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit

of Facebook's core business of online social networking and advertising. Defendants further planned to keep the enormous value of ZeniMax's VR Technology for themselves alone, and to provide no compensation whatsoever to ZeniMax.

## COUNTS

### COUNT 1— Common Law Misappropriation of Trade Secrets (Against All Defendants)

116. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

117. ZeniMax is the owner of valid and enforceable trade secrets in the ZeniMax VR Technology ("ZeniMax Trade Secrets"), including but not limited to: confidential programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to virtual reality headsets; interfaces between virtual reality headsets and interactive entertainment content and/or software; sensors and optical components calibration; latency reduction; low-latency head-tracking, including positional and absolute tracking; head and neck modeling; predictive tracking; chromatic aberration reduction; distortion, motion blur, and jitter/judder reduction; pre-warping of displayed images; combining and selecting devices, displays, cables, optics, and related hardware solutions best-suited for improving the user's virtual reality experience; minimizing or removing the "screen door" effect on the display; minimizing simulator sickness and/or motion sickness for users; and creating a commercially-viable virtual reality headset. ZeniMax Trade Secrets include valid, enforceable trade secrets in the confidential, proprietary components of ZeniMax's "*DOOM 3: BFG Edition*" computer program code.

118. All of the ZeniMax Trade Secrets were confidential, proprietary, and highly valuable secrets prior to disclosure to Defendants.

119. The ZeniMax Trade Secrets are not generally known or readily ascertainable.

120. ZeniMax took reasonable precautions to maintain the secrecy of the ZeniMax Trade Secrets, including confidentiality provisions in key employment agreements, secured

password-protected networks and databases, and confidentiality agreements with third-parties to whom the information is disclosed, including the Non-Disclosure Agreement. ZeniMax also took reasonable precautions by instructing Defendants not to make unauthorized use of ZeniMax's proprietary information.

121. ZeniMax disclosed and provided ZeniMax Trade Secrets to Oculus and Luckey in confidence, pursuant to the Non-Disclosure Agreement.

122. Defendants knew or had reason to know of the obligations of Oculus and Luckey to keep confidential and refrain from unauthorized use of ZeniMax Trade Secrets, and by their actions and conduct Defendants established that Oculus was bound by the Non-Disclosure Agreement as if it were a signatory thereto.

123. Oculus and Luckey breached that confidence beginning in 2012 by using and/or disclosing ZeniMax Trade Secrets in developing, designing, programming, testing, demonstrating, and marketing the Rift headset. Oculus and Luckey further breached that confidence by providing to Facebook access to ZeniMax Trade Secrets.

124. Oculus and Luckey knew that by hiring former ZeniMax employees, such employees would inevitably disclose ZeniMax Trade Secrets.

125. Defendants intended to leverage and commercially exploit ZeniMax Trade Secrets for the financial benefit of Facebook's core business of online social networking and advertising. In furtherance of that plan and without authorization from ZeniMax, Facebook improperly acquired access to ZeniMax Trade Secrets through its acquisition of Oculus, and intended to leverage, commercially exploit, and otherwise use the ZeniMax Trade Secrets. Facebook had notice that the ZeniMax Trade Secrets were confidential, proprietary, and highly

valuable, and that obtaining access to ZeniMax Trade Secrets from Oculus and Luckey would be a breach of the Non-Disclosure Agreement between ZeniMax and Oculus and Luckey.

126. Defendants are jointly and severally liable for their conduct by acting in concert to produce an indivisible injury, and acting pursuant to a common purpose to which Defendants were a part.

127. The foregoing acts constitute common law misappropriation of ZeniMax's trade secrets.

128. Defendants' conduct challenged herein was undertaken with full knowledge of ZeniMax's rights.

129. Defendants' conduct was malicious, deliberate, and willful, or in the alternative at least grossly negligent.

130. Defendants' misappropriation of ZeniMax's trade secrets has caused and will continue to cause damage to ZeniMax in an amount to be determined at trial.

**COUNT 2—Copyright Infringement**
**(Against All Defendants)**

131. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

132. ZeniMax owns and has a valid copyright in the "*DOOM 3: BFG Edition*" computer program. A true and correct copy of the certificate of copyright registration, Copyright Registration No. PA0001851913, is attached as Exhibit 1.

133. ZeniMax owns and has valid copyrights in "*ZeniMax VR Testbed Code*" and "*ZeniMax VR Implementation Code.*" A true and correct copy of the certificates of copyright registration, Copyright Registration Nos. TXu 1-897-004 and TXu 1-897-005 are attached as Exhibits 2 and 3, respectively.

134. ZeniMax's "*DOOM 3: BFG Edition*" computer program, "*ZeniMax VR Testbed Code*," and "*ZeniMax VR Implementation Code*" (collectively, "ZeniMax Copyrighted Materials") contain computer code that embodies ZeniMax's VR Technology and constitute copyrightable subject matter within the meaning of 17 U.S.C. § 102.

135. Oculus and Luckey had access to ZeniMax Copyrighted Materials through current and former ZeniMax employees.

136. Without authorization, Oculus and Luckey have copied, publicly displayed, and distributed products (including versions of Oculus Software Development Kits ("Oculus SDKs")) derived from ZeniMax's Copyrighted Materials in whole or in part, and will continue to do so.

137. Products of Oculus and Luckey, such as versions of Oculus SDKs, are substantially similar to the protected elements of ZeniMax's Copyrighted Materials.

138. Defendants have no license or any other form of permission to commercially copy, sell, license or distribute the ZeniMax Copyrighted Materials.

139. Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials. As the sole owner of Oculus, Facebook has a direct financial interest in the infringing activity of Oculus and Luckey and has the right and ability to supervise their infringing acts. Facebook substantially participated in the infringing activity of Oculus and Luckey by inducing, causing, or materially contributing to the infringing conduct.

140. Defendants' acts of direct, contributory, and/or vicarious copyright infringement are willful, deliberate, and in utter disregard of ZeniMax's copyrights, pursuant to the Copyright Act, 17 U.S.C. § 504.

141. Defendants' acts of direct, contributory, and/or vicarious copyright infringement have caused and will continue to cause damage to ZeniMax in an amount to be determined at trial.

**COUNT 3—Breach of Contract**
**(Against Oculus and Luckey)**

142. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

143. ZeniMax entered into a valid, enforceable and binding written contract with Palmer Luckey, effective May 24, 2012.

144. ZeniMax fully performed its obligations under the Non-Disclosure Agreement.

145. ZeniMax provided Luckey with proprietary information under the Non-Disclosure Agreement, including ZeniMax Trade Secrets, ZeniMax Copyrighted Materials, and other confidential information (collectively, "Contract-Protected Information").

146. Contract-Protected Information disclosed to Luckey was not public knowledge and did not become public knowledge at any time.

147. Luckey was not entitled to Contract-Protected Information free of any obligation of confidentiality prior to ZeniMax's disclosure of the information to Luckey.

148. Under the Non-Disclosure Agreement, Luckey agreed not to use or disclose ZeniMax's Contract-Protected Information without ZeniMax's approval. Luckey further agreed to restrict use of the Contract-Protected Information for a "Proper Purpose" approved by ZeniMax, and to disclose such information only to his directors, officers, employees, or attorneys who clearly have a need-to-know. Luckey did not and does not have any directors, officers, or employees in his personal capacity.

149. Luckey disclosed Contract-Protected Information to third-parties, including Oculus, without expressly-authorized permission or authorization from ZeniMax. Oculus knew and had reason to know that Luckey received such information pursuant to the Non-Disclosure Agreement.

150. By their actions and conduct, Defendants established that Oculus was also bound by the Non-Disclosure Agreement as if it were a signatory thereto.

151. Oculus and Luckey breached the Non-Disclosure Agreement by using ZeniMax's Contract-Protected Information for testing, developing, demonstrating, and promoting the Rift headset, and providing to Facebook access to ZeniMax's Contract-Protected Information. The breach of contract by Oculus and Luckey was a wrongful use of ZeniMax's Contract-Protected Information and not within the "Proper Purpose" authorized by the Non-Disclosure Agreement.

152. The breach of contract by Oculus and Luckey has caused and will continue to cause damage to ZeniMax in an amount to be determined at trial, plus attorneys' fees and costs for bringing this action as provided for in the Non-Disclosure Agreement.

**COUNT 4—Tortious Interference with Contract**
**(Against Facebook)**

153. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

154. ZeniMax entered into a valid, enforceable and binding written contract with Palmer Luckey, effective May 24, 2012.

155. ZeniMax fully performed its obligations under the Non-Disclosure Agreement.

156. Under the Non-Disclosure Agreement, Luckey agreed not to use or disclose ZeniMax's Contract-Protected Information without ZeniMax's approval. Luckey further agreed to restrict use of the Contract-Protected Information for a "Proper Purpose" approved by

ZeniMax, and to disclose such information only to his directors, officers, employees, or attorneys who clearly have a need-to-know. Luckey did not and does not have any directors, officers, or employees in his personal capacity.

157. By their actions and conduct, Defendants established that Oculus was also bound by the Non-Disclosure Agreement as if it were a signatory thereto.

158. Facebook was aware of the existence and terms of the Non-Disclosure Agreement between ZeniMax and Oculus and Luckey.

159. Facebook interfered with the Non-Disclosure Agreement by willfully and intentionally causing Oculus and Luckey to use ZeniMax's Contract-Protected Information for a purpose not approved by ZeniMax and in breach of the obligations that Oculus and Luckey had under the Non-Disclosure Agreement.

160. This interference proximately caused irreparable injury to ZeniMax and actual damage and loss.

**COUNT 5—Unfair Competition**
**(Against Oculus and Facebook)**

161. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

162. ZeniMax owns valuable copyrightable works, trade secrets, trademarks, and confidential information, which separately and in combination create a competitive advantage in the interactive entertainment industry and were created through extensive time, labor, skill, and money.

163. Oculus and Facebook committed one or more illegal acts, including copyright infringement, trademark infringement, and trade secret misappropriation, by using ZeniMax's

intellectual property without authorization to develop, promote, and commercialize the Rift headset.

164. By their actions and conduct, Defendants established that Oculus also was bound by the Non-Disclosure Agreement as if it were a signatory thereto.

165. Oculus breached the terms of a Non-Disclosure Agreement; took ZeniMax's intellectual property; commercially exploited it for its own gain; never obtained a license to use any of ZeniMax's property, technology or information; never compensated ZeniMax; and now unfairly stands to realize billions of dollars in value trading off of ZeniMax's hard work.

166. Facebook acquired Oculus with full knowledge of ZeniMax's claims against Oculus and Luckey for their misconduct.

167. As a direct result of Oculus's illegal conduct, Oculus and Facebook have deprived ZeniMax of the control and dissemination of its proprietary inventions and confidential know-how concerning virtual reality headset devices and related virtual reality technology.

168. Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders for the time, money, and effort invested in developing revolutionary virtual reality technology.

169. Oculus violated the principles of the common law of unfair competition by trading on the goodwill of ZeniMax, competing unfairly, and by creating a false association between Oculus and ZeniMax. Facebook violated the principles of the common law of unfair competition by attempting to profit from ZeniMax's intellectual property and the wrongful acts of Oculus.

170. Oculus intentionally solicited and hired ZeniMax employees to deprive ZeniMax of institutional knowledge and intellectual capital, as well as to surreptitiously gain further unauthorized access to ZeniMax's property.

171. Oculus and Luckey knew that by hiring former ZeniMax employees, such employees would inevitably disclose confidential and proprietary ZeniMax information and technology.

172. Defendants are jointly and severally liable for their conduct by acting in concert to produce an indivisible injury, and acting pursuant to a common purpose to which Defendants were a part.

173. The wrongful conduct of Oculus and Facebook has caused and will continue to cause significant commercial harm to ZeniMax in an amount to be determined at trial.

**COUNT 6—Unjust Enrichment**
**(Against All Defendants)**

174. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

175. By their actions and conduct, Defendants established that Oculus also was bound by the Non-Disclosure Agreement as if it were a signatory thereto.

176. Oculus and Luckey took ZeniMax's intellectual property pursuant to a Non-Disclosure Agreement. Defendants commercially exploited it for their own gain, amounting to tens of millions of dollars. Defendants never obtained a license to use any of ZeniMax's property, technology or information. Defendants have now been unjustly enriched by billions of dollars in value exploiting ZeniMax's hard work and VR Technology as if it were their own.

177. Defendants took unlawful advantage of ZeniMax's employees, software, and disclosures in confidence to Oculus and Luckey by knowingly using ZeniMax's confidential

information and know-how to develop, design, improve, demonstrate, market, and promote the Rift headset, and then selling Oculus with ZeniMax's VR Technology to Facebook.

178. Defendants have knowingly and wrongfully obtained and/or passively received a substantial, commercial benefit from ZeniMax's contributions to the Rift headset, and related VR Technology, including technical improvements, design solutions, and marketing promotion provided by ZeniMax to Oculus and Luckey.

179. Defendants refuse to compensate ZeniMax for the value of ZeniMax's contributions to the modified Rift and related technology. As such, it would be unconscionable to permit Defendants to profit from a "free-ride" on ZeniMax's years of work in researching and developing virtual reality technology, from their misappropriation of ZeniMax's trade secrets, from their violation of ZeniMax copyrights and trademarks, and from their announced sale of Oculus with ZeniMax's VR Technology.

180. Defendants were also unjustly enriched by gaining unauthorized access to ZeniMax's intellectual property through the concerted effort of recruiting and hiring multiple former ZeniMax employees who are all subject to strict confidentiality and non-solicitation obligations. Oculus and Luckey knew that by hiring former ZeniMax employees, such employees would inevitably disclose confidential and proprietary ZeniMax information and technology. Oculus and Luckey knew that the manner in which the employees were hired violated the employees' contracts with ZeniMax. Oculus and Luckey sought to enrich themselves by recruiting ZeniMax personnel with needed expertise rather than compensate ZeniMax for its VR Technology.

181. Facebook has also been unjustly enriched by gaining unauthorized access to ZeniMax's intellectual property and leveraging and commercially exploiting ZeniMax's

intellectual property for the financial benefit of Facebook's core business of online social networking and advertising.

182. Defendants' unlawful course of conduct, including their blatant misappropriation of ZeniMax's intellectual property, was planned and intended to keep the enormous value of ZeniMax's VR Technology for themselves alone, and to give ZeniMax nothing.

183. Defendants are jointly and severally liable for their conduct by acting in concert to produce an indivisible injury, and acting pursuant to a common purpose to which Defendants were a part.

184. Defendants' wrongful conduct and unjust enrichment caused and will continue to cause damage to ZeniMax in an amount to be determined at trial.

**COUNT 7—Trademark Infringement**
**(Against Oculus and Luckey)**

185. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

186. ZeniMax or one of its affiliates is the owner of the entire right, title, and interest in and to valid, subsisting, and uncancelled United States Trademark Registrations No. 2,050,083 for "DOOM"; No. 2,928,605 for "DOOM 3"; No. 2,303,100 for "DOOM II" and design; No. 2,165,125 for "ID"; No. 3,923,244 for "RAGE"; No. 4,198,972 for "RAGE" and design; No. 4,094,299 for "RAGE" and design; No. 3,972,050 for "RAGE" and design; No. 4,080,839 for "SKYRIM"; No. 4,097,150 for "SKYRIM"; and No. 4,280,859 for "SKYRIM" (collectively, the "ZeniMax Marks"). Reg. Nos. 2,050,083, 2,928,605, and 2,165,125 are incontestable pursuant to 15 U.S.C. § 1065.

187. The use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks and is likely to cause confusion and to

cause the relevant public to mistakenly believe that Defendants' products and services emanate from, are authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with ZeniMax in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

188. The acts of Oculus and Luckey are without license from or permission of ZeniMax.

189. The acts of Oculus and Luckey have been undertaken with full knowledge of ZeniMax's rights in the ZeniMax Marks.

190. The conduct of Oculus and Luckey challenged herein was malicious, deliberate and willful.

191. ZeniMax has suffered damages as a result of the violations of law by Oculus and Luckey, and will continue to suffer irreparable harm as a result of such violations of law for which there is no adequate remedy at law.

**COUNT 8—False Designation**
**(Against Oculus and Luckey)**

192. ZeniMax incorporates by reference all preceding and succeeding paragraphs of this Complaint.

193. The conduct of Oculus and Luckey challenged herein is intended to and is likely to cause confusion and to cause the relevant public to mistakenly believe that Defendants' products and services emanate from, are authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with ZeniMax and constitutes unfair competition, false endorsement and false association in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

194. The conduct of Oculus and Luckey challenged herein has been undertaken with full knowledge of ZeniMax's rights in the ZeniMax Marks and other registered and unregistered

trademarks and service marks of ZeniMax and other well-known indicia of ZeniMax and its goods and services.

195. The conduct of Oculus and Luckey challenged herein was malicious, deliberate and willful.

196. ZeniMax has suffered damages as a result of the violations of law by Oculus and Luckey, and will continue to suffer irreparable harm as a result of such violations of law for which there is no adequate remedy at law.

## DEMAND FOR JURY TRIAL

ZeniMax hereby demands a trial by a jury on all issues so triable by right.

## PRAYER FOR RELIEF

For the foregoing reasons, ZeniMax asks that the Court issue citation for Defendants Oculus, Luckey, and Facebook to appear and answer, and that ZeniMax be awarded a judgment against Defendants for the following:

a. Actual Damages;

b. Restitution;

c. Disgorgement;

d. Unjust Enrichment;

e. Equitable Relief;

f. Injunctive Relief;

g. Punitive and Exemplary Damages;

h. Statutory Damages under 17 U.S.C. § 101 et seq.;

i. Enhanced Damages;

j. Prejudgment and Post-Judgment Interest;

k. Court Costs;

l. Attorney Fees; and

m. All other relief to which ZeniMax is entitled.

Dated: August 28, 2014
Dallas, Texas

Respectfully submitted,

s/ Phillip B. Philbin
PHILLIP B. PHILBIN

PHILLIP B. PHILBIN
Texas State Bar No. 15909020
E-mail: phillip.philbin@haynesboone.com
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone No.: 214-651-5000
Facsimile No.: 214-651-5940

P. ANTHONY SAMMI
E-mail: Anthony.Sammi@skadden.com
KURT WM. HEMR
E-mail: Kurt.Hemr@skadden.com
JAMES Y. PAK
Texas State Bar No. 24086376
E-mail: James.Pak@skadden.com
KRISTEN VOORHEES
E-mail: Kristen.Voorhees@skadden.com
(admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone No.: 212-735-3000
Facsimile No.: 212-735-2000

**ATTORNEYS FOR PLAINTIFFS ZENIMAX MEDIA INC. AND ID SOFTWARE LLC**

**CERTIFICATE OF SERVICE**

On August 28, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Dated: August 28, 2014

s/ Phillip B. Philbin
Phillip B. Philbin

# COMPLAINT
# EXHIBIT 1

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Maria A. Pallante

Register of Copyrights, United States of America

**Registration Number**
PA 1-851-913

**Effective date of registration:**
January 28, 2013

## Title

**Title of Work:** DOOM 3 BFG Edition for PC

## Completion/Publication

**Year of Completion:** 2012

**Date of 1st Publication:** October 15, 2012 **Nation of 1st Publication:** Australia

## Author

- **Author:** Id Software LLC

**Author Created:** text, editing, computer program, artwork

**Work made for hire:** Yes

**Citizen of:** United States **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Id Software LLC

3819 TOWNE CROSSING BOULEVARD, SUITE 222, Mesquite, TX, 75150, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program, artwork

**New material included in claim:** text, editing, computer program, artwork

## Certification

**Name:** Thomas E. Zutic

**Date:** January 11, 2013

**Applicant's Tracking Number:** 29454-4

**Correspondence:** Yes

# COMPLAINT EXHIBIT 2

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Register of Copyrights, United States of America

**Registration Number**
TXu 1-897-004

**Effective date of registration:**
May 19, 2014

## Title

**Title of Work:** ZeniMax VR Testbed Code

## Completion/Publication

**Year of Completion:** 2012

## Author

- **Author:** ID Software LLC

**Author Created:** text, editing, computer program

**Work made for hire:** Yes

**Citizen of:** United States **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** ID Software LLC

3819 TOWNE CROSSING BOULEVARD, SUITE 222, Mesquite, TX, 75150

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program

**New material included in claim:** text, computer program

## Certification

**Name:** Ryan C. Compton

**Date:** May 19, 2014

**Applicant's Tracking Number:** 29454.4

---

**Correspondence:** Yes

# COMPLAINT EXHIBIT 3

# Certificate of Registration




This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Register of Copyrights, United States of America

**Registration Number**
TXu 1-897-005

**Effective date of registration:**
May 19, 2014

## Title

**Title of Work:** ZeniMax VR Implementation Code

## Completion/Publication

**Year of Completion:** 2013

## Author

- **Author:** ID Software LLC

**Author Created:** text, editing, computer program

**Work made for hire:** Yes

**Citizen of:** United States **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** ID Software LLC

3819 TOWNE CROSSING BOULEVARD, SUITE 222, Mesquite, TX, 75150

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program

**Previous registration and year:** PA0001851913

**New material included in claim:** text, editing, computer program

## Certification

**Name:** Ryan C. Compton

**Date:** May 19, 2014

**Applicant's Tracking Number:** 29454.4

---

**Correspondence:** Yes